```
 1                IN THE UNITED STATES DISTRICT COURT
              FOR THE SOUTHERN DISTRICT OF FLORIDA
 2                   FORT LAUDERDALE DIVISION
                 CASE NO. 0:18-cr-60047-BB
 3


 4
    UNITED STATES OF AMERICA,
 5
              Plaintiff,                September 21, 2018
 6                                      1:31 p.m.
              vs.
 7
    IVONNE RUSSA MOSQUEDA,
 8
              Defendant.                Pages 1 THROUGH 39
 9  _____

10

11                  TRANSCRIPT OF SENTENCING
              BEFORE THE HONORABLE BETH BLOOM
12               UNITED STATES DISTRICT JUDGE

13
    Appearances:
14
    FOR THE GOVERNMENT: UNITED STATES ATTORNEY'S OFFICE
15                      ANITA GAIL WHITE, AUSA
                        500 East Broward Boulevard
16                      Fort Lauderdale, Florida 33394

17
    FOR THE DEFENDANT:  BERRIO & BERRIO, PA
18                      JUAN DIEGO BERRIO, ESQ.
                        2333 Brickell Avenue, Suite A-1
19                      Miami, Florida 33129

20
    COURT REPORTER:     Yvette Hernandez
21                      U.S. District Court
                        400 North Miami Avenue, Room 10-2
22                      Miami, Florida 33128
                        yvette_hernandez@flsd.uscourts.gov
23

24

25
```

```
 1          (Call to order of the Court, 1:31 p.m.)
 2          COURTROOM DEPUTY:  Calling Criminal Case Number
 3   18-60047, United States of America v. Ivonne Russa Mosqueda.
 4          Counsel, please state your appearances for the record.
 5          MS. WHITE:  Good afternoon, Your Honor.  Anita White
 6   for the United States.  And with me at counsel table is DEA
 7   Task Force Officer Angela Hofer.
 8          THE COURT:  Good afternoon.
 9          MR. BERRIO:  Good afternoon, Your Honor.  Juan Berrio
10   on behalf of Ms. Ivonne Russa, who is present in court, and she
11   does have the benefit of an interpreter.
12          THE COURT:  Good afternoon to each of you.
13          Ms. Mosqueda, I see you are wearing an earpiece that
14   allows you to hear the interpreter.  Is the equipment working
15   properly?
16          THE DEFENDANT:  (Through Interpreter.)  Yes, Your
17   Honor.
18          THE COURT:  If at any time the equipment stops
19   working, or you are unable to hear the interpreter, if you'll
20   let me know.  All right?
21          THE DEFENDANT:  Yes, Your Honor.
22          Thank you.
23          THE COURT:  And may I have the names of the
24   interpreters that are present in the courtroom?
25          INTERPRETER 1:  Your Honor, good afternoon.  Ma'am,
```

```
 1    Joshua Elliot, federally certified interpreter.

 2                INTERPRETER 2:  And Maria Kisic.

 3                THE COURT:  Good afternoon to each of you.

 4                Is there a stipulation that our interpreters are

 5    qualified?

 6                MS. WHITE:  Yes, Your Honor.

 7                MR. BERRIO:  Yes, Your Honor.

 8                THE COURT:  And may I have the name of the Probation

 9    officer that's present in the courtroom.

10                PROBATION OFFICER:  Good afternoon, Your Honor.

11    Shannon Culberson on behalf of Probation.

12                THE COURT:  Good afternoon.

13                Ms. Russa Mosqueda, as you know, the purpose of this

14    afternoon's proceeding is to determine an appropriate sentence

15    in your case, a sentence that is sufficient, but is not greater

16    than necessary.

17                You were before this Court for a jury trial.  And on

18    July 3rd, you were found guilty, following that jury trial, to

19    three counts of a 15-count Indictment.

20                Count 1 charged you with conspiracy to distribute

21    anabolic steroids, in violation of 21, United States Code,

22    Section 846.  And Count 2 charged you with possession with

23    intent to distribute anabolic steroids, in violation of 21,

24    United States Code, Section 841, Subsection (a), Subsection

25    (1).  Count 3 charged you with maintaining a drug-involved
```

1    premises, in violation of 21, United States Code, Section 856,

2    Subsection (a), Subsection (1).

3         In preparation for this afternoon's proceeding, the

4    Court has reviewed the following documents.  Each was filed for

5    record.  So I will refer to each by docket entry:

6         Docket Entry 193 is the jury's verdict; Docket Entry

7    241 is the Draft Disclosure of the Presentence Investigation

8    Report; Docket Entry 268 are the objections that were filed on

9    your behalf to the Presentence Investigation Report; Docket

10   Entry 286 is a motion for a downward departure.  And attached

11   to that motion was the student transcript as Exhibit A, and

12   Exhibit B were letters that the Court has read from Edward

13   Caruso, Carrie Sandoval, Evelyn Diaz Enriquez, Anna

14   Wright-Case, and Priscila Chiquin Carballo.

15        Docket Entry 290 is the Final Addendum 1 Disclosure of

16   the Presentence Investigation Report; and Docket Entry 293 are

17   the responses that the Government has filed to the objections

18   filed on your behalf.

19        Have you had a full opportunity to review each of

20   these documents with your attorney, Mr. Berrio?

21        MR. BERRIO:  Your Honor, Ms. Russa has indicated that

22   she hasn't read Ms. White's response.  She hasn't reviewed it.

23   She hasn't read it.  I haven't gone over it with her.  I've

24   outlined basically what it consists of.  But that she's

25   received a copy and read it, she hasn't.

1    THE COURT:  Would you like an opportunity to review it

2  before we proceed?

3    MR. BERRIO:  I think I've spoken about it with her,

4  the gist of it.  And actually, we wanted to actually waive the

5  objections that we have raised.  After I've spoken to Ms. Russa

6  about it, and we have reviewed the addendum to the PSI, we'd

7  like to waive the objections contained -- concerning the

8  maintenance of a premises, the drug amount, the quantity, and

9  the aggravating role matter.

10    THE COURT:  All right.  So let me make sure I

11  understand.

12    First and foremost, the Government has responded to

13  the objections that were filed on Ms. Russa Mosqueda's behalf.

14  And you're telling the Court, Mr. Berrio, that you do not need

15  to review that further with Ms. Russa Mosqueda because you are

16  withdrawing all the objections that you filed?

17    MR. BERRIO:  As I spoke to her, yes.  She's in

18  agreement that we should withdraw.  Yet, we're seeking the

19  variance, a downward variance.  We would still be pursuing a

20  downward variance based on unwarranted sentencing disparities

21  with co-conspirators and the essential loss of caretaking and

22  financial support for her 18-year-old son.  We'd still like to

23  pursue that.

24    THE COURT:  All right.  Well, then let me step back

25  and ensure that it's clear for the record.

```
1              The Government has responded to certain objections

2     that were raised.  Would you like the opportunity, with the

3     assistance of the interpreter, to speak further with Ms. Russa

4     Mosqueda regarding that document?

5              MR. BERRIO:  I will then, Your Honor.

6              THE COURT:  All right.  Then why don't we pass the

7     case and give you the opportunity that you need.

8              If I may ask the interpreter to assist so that that

9     document may be reviewed.

10        (Pause in proceedings.)

11             MR. BERRIO:  Your Honor, if I may.  I've spoken to

12    Ms. Russa and she's in agreement.  We reviewed the

13    objections -- or the response to Defendant's objections from

14    the Government and she's in agreement as to not to dispute the

15    aggravating role adjustment, the maintaining a property, and

16    quantity of the drugs.

17             THE COURT:  All right.  So that would resolve -- I

18    just want to make sure, with regard to the objection to

19    Paragraph 4, that's been resolved and the Probation officer has

20    reflected the amendment to the time period of Ms. Russa

21    Mosqueda's involvement.

22             With regard to 46 and Paragraph 61, you're withdrawing

23    that objection?

24             MR. BERRIO:  46?

25             THE COURT:  That's with regard to the quantity of
```

1   drugs.

2            MR. BERRIO:  Yes, Your Honor.

3            If it's in regard to the quantity, 46, yes, we

4   withdraw the objection.

5            THE COURT:  All right.  And 49 and 64, with regard to

6   the aggravated role adjustment, the Defendant is withdrawing

7   that?

8            MR. BERRIO:  She is, Your Honor.

9            THE COURT:  That would take us to -- are there any

10  further objections that you would like to have addressed?

11           MR. BERRIO:  Objections, no.  Well, the maintaining,

12  we withdraw that one as well -- maintaining a premises.

13           THE COURT:  Are there any additional -- or are there

14  any objections that you are not withdrawing or have not been

15  resolved?

16           MR. BERRIO:  No, Your Honor.

17           It seems like everything's been resolved regarding the

18  objections and the -- and the objections to the -- the ones

19  that we just raised would affect the total offense level, which

20  were subsequent objections that were made.  But we're in

21  agreement that the level should be 25, the calculated.

22           THE COURT:  All right.  Then if you are withdrawing

23  those objections, then the Court will accept the facts

24  contained in the Presentence Investigation Report, as well as

25  the Probation officer's calculation of the advisory guidelines.

1    Is that correct?  There are no further objections that would

2    affect the facts or the calculation, Mr. Berrio?

3            MR. BERRIO:  Yes.  That is correct.

4            THE COURT:  Then based on the Probation officer's

5    calculation, with a base offense level of 20, you are

6    withdrawing the request with regard to the Defendant

7    maintaining the premises for the purposes of manufacturing or

8    distributing a controlled substance.  There's a two-level

9    increase, an additional three-level increase because Ms. Russa

10   Mosqueda was a manager or supervisor and the criminal activity

11   involved five or more participants, resulting in an adjusted

12   offense level of 25.

13           Ms. Russa Mosqueda has a criminal history category of

14   I, placing Ms. Russa Mosqueda in an advisory guideline range of

15   57 to 71 months; is that correct?

16           MR. BERRIO:  That's my calculation, Your Honor.

17           MS. WHITE:  Yes, Your Honor.

18           THE COURT:  Ms. Russa Mosqueda, in addressing the

19   3553(a) factors, if there is anything that you would like to

20   say directly to the Court, certainly you may do so.  If there

21   are individuals that are present on your behalf that would like

22   to speak directly to the Court, they may certainly do so.

23           I'm certain that Mr. Berrio will make further argument

24   on your behalf, but I did want to give you that opportunity.

25           MR. BERRIO:  Your Honor, there is several individuals

9

```
1    here that support her.  Natalie Rodriguez would like to say

2    some words on her behalf.

3              THE COURT:  Certainly.

4              MR. BERRIO:  Jose Losaco (phonetic listing) and Kevin

5    Chase.

6              And Ms. Russa, I believe, would also like to address

7    the Court, once I've made argument regarding the downward

8    variance that we're requesting under 3553.

9              THE COURT:  All right.  Certainly.

10             MR. BERRIO:  Should I proceed, Your Honor?

11             THE COURT:  Yes of course.

12             MR. BERRIO:  Okay.  Under 3553, I was looking at this

13   conspiracy -- or actually, there was two conspiracies.  There

14   was a conspiracy at the Sheridan Street apartment, where

15   Ms. Russa was at the date of the arrest on September 16th,

16   2016 -- September 13th, 2016.  She was present there.  She was

17   present with three other individuals, Laura, Hunter, who were

18   convicted, and Randy, who was acquitted at trial.

19             They were arrested.  And that lab, which is apparently

20   one of Hugo's labs, was shut down that day.  Ms. Russa was

21   taken to -- into custody and she was detained at the Broward

22   Sheriff's Office -- or at the county jail in Broward for 30

23   days.  I believe Your Honor should take that into account in

24   fashioning a sentence for her.

25             That case was ultimately dismissed, but she did spend
```

1    the 30 days in jail.  It was ultimately dismissed and Ivonne

2    believed that this case was over, that she was -- she learned

3    her lesson.  She withdrew from the activity.  She left.  She

4    disassociated herself from dealing with Hugo Urdaneta and Sport

5    Nutrition Center, Inc.  The others as well, the others that

6    were arrested with her, they never went back to this activity.

7    She even kept her same phone number.  She didn't change it.

8    She stopped.  She went and she focused on her son Rommer

9    Villalba, who is a minor at that time.  He's in high school.

10   She focused on her son and she relocated to Indiana.  She found

11   a job and began working there.

12           And so I compared her conduct, and I said:  All right.

13   At the Sheridan Street, there was four people.  Hugo Urdaneta

14   was the leader, the leader of this group, of this organization,

15   of this lab.  He was the one who was profiting here greatly,

16   and this gentleman never even showed up on that date.  Ivonne

17   met with Special Agent Hofer and explained everything that they

18   were doing there.  She said:  "This is what he does.  This is

19   what he does.  This is what Laura does.  This is what I do.

20   This is our boss."  She said everything, everything she had to

21   say.

22           And I believe that triggered a further investigation

23   into Hugo.  So she cooperated with Agent Hofer's investigation

24   that day.  She gave a full statement and identified what she

25   was doing there, why she was there, what the company was about,

1    and what they were doing.

2          Agent Hofer even asked her:  "Do you know that this is

3    illegal?"  And she said:  "I think it's some kind of a penalty,

4    a fine," something of that nature.  She thought it was a civil

5    matter, based on representations made to her by her boss Hugo.

6          So that -- she went to jail for 30 days.  She said:

7    "This is obviously not correct.  This is obviously not a

8    legitimate business."  She withdrew.  She says:  "I'm not

9    dealing with that gentleman anymore."  There's no evidence

10   whatsoever that she continued to play any part with this

11   organization, with Sport Nutrition Center, after that date that

12   she was arrested.

13         So what did Hugo do?  Hugo set up a new -- a new

14   place, a new lab, as it's called, at Rodman Street, a Rodman

15   Street lab, to do basically what they were doing at Sheridan

16   Street.  He recruited new people because Ivonne said:  "I'm not

17   involved in this anymore.  I'm not doing anything here."  And

18   he recruited new people to replace Ivonne, Laura, Hunter,

19   everybody, and he recruited family members.  Apparently, some

20   cousins of his, Nelson Urdaneta, who was sentenced to 24 months

21   in prison, and Jorge Contreras, who was also sentenced to 24

22   months in prison.  They were operating and running and working

23   at the Rodman Street lab.  The same thing that was being done

24   at the Sheridan Street -- or Ivonne had done at the Sheridan

25   Street lab.

1   So I said:  Well, who does Ivonne -- to avoid unwanted

2   sentencing disparities, who does Ivonne assimilate or seem

3   similar to at the Rodman Street lab?  And I said:  Well, maybe

4   she's not as -- she's somewhat like Nelson Urdaneta, who was, I

5   believe, Hugo's cousin or uncle.  And he was actually living at

6   the Rodman Street address, at the lab.  Ivonne wasn't living at

7   the Sheridan Street lab.  He actually seemed to be the person

8   who was maybe controlling or had more authority at that

9   address, because he was actually -- I believe in one of the

10  WhatsApps he reprimanded Jorge Contreras and telling him:

11  "Don't be late.  We already have orders from Hugo."  So

12  obviously, they were filling orders and just doing what was

13  previously done at Sheridan Street.

14          But I said:  "You know what?  It seems like Nayibe Noa

15  is the person who is most similar to Ivonne Russa Mosqueda.

16  Nayibe Noa is Hugo Urdaneta's mother.  And Nayibe Noa -- the

17  state -- or the Government has recommended a 24-month sentence

18  for her in their Sentencing Memorandum.  She hasn't been

19  sentenced yet.  She's requesting some type of a house arrest or

20  detention.  The Government has recommended 24 months for her.

21  And I assimilate Ms. Russa most similarly to Noa.

22          And why?  Because -- this is all outlined in the

23  Government's Sentencing Memorandum regarding Noa.  The

24  Government says that Nayibe Noa was at the center of Rodman

25  Street -- of the Rodman Street conspiracy.  She was at the

1    center of it and she did many things.  For example, she leased

2    the Rodman Street property.  It was under her name, unlike the

3    Sheridan Street where Ivonne was not on that lease.  She

4    distributed steroids, like Ivonne is accused of doing and

5    proven at court in trial that she did.

6         She apparently gave cash to two codefendants at Rodman

7    Street -- this is Nayibe Noa -- received shipments from China,

8    which Ivonne also did, leased Rodman Street lab.  Ivonne didn't

9    do that.  Paid Rodman Street address.  I don't think there's

10   any evidence that Ivonne paid personally the rent at one of the

11   labs -- at Sheridan.

12        Nayibe delivered materials to the lab, received orders

13   for delivery.  In fact, when she was arrested, she had, I

14   believe, over 60,000 units just in her car that she was going

15   to distribute, I believe.

16        And the Government said that she received -- Nayibe

17   Noa received as much if not more than the codefendants in terms

18   of compensation.

19        Well, the Government says:  "Well, you know, maybe she

20   wasn't compensated with a salary, but she was living in a

21   high-rise building, a gated high-rise building that overlooked

22   the water."  So the Government believes that Nayibe Noa was

23   definitely doing very well with this conspiracy that her son

24   had initiated.

25        And Nayibe Noa -- and I found it very telling -- that

```
1    the Government said that Nayibe Noa's participation can be

2    dated back as early as May 2016.  And that's a significant date

3    because that is approximately four months before the Sheridan

4    Street lab was shut down, when they were arrested.  So Nayibe

5    Noa knew -- I'm convinced she knew that this Sheridan Street

6    apartment lab was shut down.  And at that time, she could have

7    easily said:  "You know, this is wrong, what we're doing is

8    wrong," and she could have withdrawn.  She could have said:

9    "I'm not participating in this anymore.  It's illegal.  I'm not

10   doing it."  But she didn't.

11        She actually doubled down.  And as the Government

12   says, she actually participated more.  She got more involved in

13   the conspiracy.  But this time they set it up at Rodman Street.

14   And she got more involved.  And I think that speaks volumes

15   between Nayibe Noa and Ivonne Russa.  Ivonne withdrew.  Nayibe

16   said:  "No.  I'm going to get more involved now.  I'm going to

17   fill in that vacuum and that gap."  And she did, apparently.

18        And she went further.  She leased properties for the

19   specific purpose of this lab.  She was distributing -- and the

20   Government said that she was fully knowledgeable of the scope

21   and structure of the enterprise.  She was at the center of it.

22        So I don't think that the Government could show that

23   Ms. Russa, even though we haven't objected and agreed to the

24   three-level aggravated role adjustment, is more culpable than

25   Nayibe Noa.  She's not.  And I think the Court should take that
```

1    into account and take into account what happened after the

2    Rodman Street -- I mean the Sheridan Street lab was shut down.

3    Ivonne decided to go and distance herself from this group.  And

4    Nayibe didn't.  She continued and she became more involved.

5        I think Your Honor should take into account that

6    Nayibe Noa actually refused at the beginning that she was

7    involved in this activity.  She said: "I'm not involved in

8    this activity.  I don't know what's happening here."  I think

9    she refused a package.  She denied being involved.  Ivonne

10   cooperated.  She said: "This is what we do here.  This is

11   what's happening."  She didn't hide anything from Agent Hofer.

12       I think Your Honor should also note that Hugo

13   Urdaneta, who was obviously the leader of both of these labs,

14   received a 46-month sentence.  He received a 46-month sentence.

15   And by no stretch of the imagination do I believe that Ivonne

16   should receive a higher sentence than Hugo Urdaneta, especially

17   considering that he doubled down.  He opened up another lab,

18   knowing that it's wrong, and he did it.  And he was the leader.

19   And Hugo also pled, I believe, to money laundering, which

20   Ivonne never pled to -- or she was never charged with it.

21       She was charged with the three counts, which is the

22   same thing that Nayibe Noa and the other people, I believe, are

23   charged with and pled to, which are Nelson Urdaneta and Jorge

24   Contreras and Nayibe Noa.  Hugo has another count of money

25   laundering, which Ivonne does not.  I think that should also be

1   noted.  And Hugo received a 46-month sentence.  They're saying

2   that he cooperated, he did some type of cooperation.  Even

3   though he didn't come testify at our trial, he did some kind of

4   cooperation.  So the Government said that he received some type

5   of a variance for that cooperation.

6         Ivonne, like I want to repeat, or like I said, gave a

7   full account.  She even identified Hugo and said:  "Look, this

8   is the person."  And that's where I think he became a target

9   and this further investigation unfolded based on information

10  provided by Ivonne, which Agent Hofer, I believe, testified

11  that a lot of it was accurate and helped in initiating a

12  further investigation into Hugo's activities.

13        I ask that you take that into consideration, the need

14  to avoid unwarranted sentencing disparities.  Sentence her to a

15  sentence similar to Nayibe Noa or the recommendation made by

16  the Government with regard to Nayibe Noa, which is the 24

17  months.

18        I think it's also important to note that Candido

19  Garcia, who was involved in this conspiracy also, he got 23

20  months.  He received a 23-month sentence, and he was certainly

21  aware and he was involved in this conspiracy before the

22  Sheridan Street lab was shut down and he continued into the

23  Rodman Street lab.  So he doubled down.  He didn't withdraw, as

24  Ivonne did.

25        Ivonne is a person that came here from Venezuela,

1    fleeing the government there, because she was conducting an

2    investigation there, an airport investigation, some type of an

3    accident, aviation accident.  The government apparently didn't

4    want her to prepare a report and meet with international

5    agencies from the US, from, I believe, France, and from

6    Colombia.  And so she was kidnapped, threatened -- and

7    threatened to be killed in Venezuela.  And so she had to flee

8    there.  And she fled with her two children, who she has raised

9    since they were little kids on her own.  She's raised them on

10   her own.  She came here to the United States, not knowing the

11   language.  She was granted political asylum because they found

12   her fear was credible and it was the government that was

13   pursuing her in Venezuela.

14          She came her and raised her children.  She's raised

15   her children on her own.  Her oldest -- well, her youngest

16   son -- she has two children, Laura, who you know of, who is

17   also involved in this matter, and she has Rommer.  Laura is

18   older than Rommer by, I would say, eight or nine years.  She's

19   helped Ivonne raise Rommer.

20          With this predicament that they are in right now --

21   Rommer is in high school.  He needs somebody to care for him,

22   to watch him, to give him the essential caretaking and

23   financial support that he needs in order to finish his high

24   school year and to progress in life.

25          We're asking that Your Honor also take that into

```
 1    consideration, the fact that Rommer has nobody to care for him
 2    at this time, like his mother and his sister who've raised him
 3    since he was a little child.  He's in school now.  It's my
 4    understanding that he's losing his hair and very anxious, very
 5    nervous.  He doesn't -- his rock, the person who's raised him
 6    his whole life, is facing this Court for sentencing and could
 7    go to prison for a long time.  And we'd ask that you take that
 8    into account in fashioning a sentence that is sufficient but
 9    not greater than necessary to punish Ivonne for this activity.
10         I think it's very important and noteworthy that she
11    never ran from this.  She never ran from this.  She's had many
12    opportunities to run.  She hasn't.  She was sent to -- the case
13    in state court was dismissed.  She relocated to Indiana.  So
14    she was making a life for herself with Rommer there.  Rommer's
15    grades improved tremendously.  I believe I've attached a copy
16    of his report card.  I believe he was getting all As in Indiana
17    in the school.  He was doing very well.
18         They thought that this was behind them.  But it
19    wasn't.  It came back.  And in February of this year, Ivonne
20    found out that Laura was arrested here in Broward County.  And
21    as soon as she found out, she came back by herself.  There was
22    no prompting for her to come down.  Nobody said:  "We're going
23    to go get you.  We're going to go look for you."  She got on a
24    bus, took a two-day ride down and presented herself in court in
25    Broward.  I think that speaks a lot in terms of saying:  "I'm
```

1   here.  This is me.  You tell me what you want to do.  I'm here

2   to answer for any allegation, any accusations made to me --

3   against me."  And she has.  She's answered.  She's here.  She's

4   here again today, and we're asking this Court for leniency in

5   her sentencing.

6          And to give her a downward variance that would allow

7   her to continue to provide the care and support for Rommer, her

8   son, who is in a very difficult situation right now.  And we're

9   asking that you sentence her to 24 months, which is similar to

10  the recommendation made for Nayibe Noa.  That's the sentence

11  given to Jorge Contreras and to Nelson Urdaneta, who I think

12  did similar conduct to Ivonne.  They -- similar conduct.  They

13  pled.  That's understood.  They pled.  They accepted

14  responsibility.  And because of that, perhaps the aggravating

15  role adjustment for Nayibe Noa wasn't factored in.  Ivonne

16  didn't plead.  She went to trial, as you know.  And she was

17  convicted.

18         But aside from that, I'd ask that Your Honor exercise

19  your favorable discretion, recognize that she did not double

20  down.  She withdrew.  She's been here every time.  She has a

21  son who's up in the air right now, that we don't know what's

22  going to happen with, Rommer.  And depending on your rulings

23  here, we'll find something, we'll find some way for Rommer to

24  get along, I guess.  But we're asking that Your Honor take that

25  into consideration and place her on home confinement for 24

1    months as her sentence.

2              THE COURT:  Thank you, Mr. Berrio.

3              Were there individuals that wanted to speak, including

4    Ms. Russa Mosqueda?

5              MR. BERRIO:  Yes, Your Honor.

6              Natalie Rodriguez.

7              And she's going to need the aid of an interpreter.

8              THE COURT:  Certainly.

9              MR. BERRIO:  If she could just say some words on

10   behalf ...

11             THE COURT:  Good afternoon.

12             MS. RODRIGUEZ:  (In English.)  Good afternoon.

13             THE COURT:  Good afternoon, Ms. Rodriguez.

14             MS. RODRIGUEZ:  (Through Interpreter.)  Good afternoon

15   to everyone.

16             THE COURT:  I'm not going to ask you questions.  But

17   Mr. Berrio stated that you wanted to say something to the

18   Court.

19             MS. RODRIGUEZ:  Yes, Your Honor.

20             I am here because I believe that I am the person that

21   knows Ivonne the most, the most than anyone else could know

22   her.  She knows me since I was five years of age.  And I know

23   her -- I remember her since she was 10 -- since I was 10.  She

24   was one of the best friends of my older sister.

25             So when I was growing up, one of my very first outings

1  was with her and my sister.  And she gave me the very best

2  advice always.  She protected me.  She cared for me and she

3  gave me the very best advice for me to be able to lead the life

4  that I lead right now.

5       In our country, she's a very well-known person.  She

6  is a very well-known professional in the area where she works

7  at, at the airports.  She's very well-known there.  Even though

8  10 years have gone by, her name is still known over there.

9  She's still renowned over there in the area that has to do with

10  airports, airplanes in the area where she worked at.

11       She never had a legal issue never, ever.  She was very

12  well-known and she was very well-respected and she had a

13  perfect conduct and demeanor everywhere she went to.

14       She was a boss at the Caracas airport.  She also

15  participated in the laws that -- the laws that were enacted

16  that had changed regarding airports and aviation.  There was a

17  small group that participated in those changes, and she was one

18  of those people that was chosen to do so.

19       When she comes to this country, during that time, I

20  was diagnosed with cancer and my daughter was three years of

21  age, and I was all alone with my daughter.  And she had

22  nothing, but she would always help me.  She will go looking for

23  food at churches and she will give me food.  She was always a

24  very good person, an excellent human being, an excellent

25  person.

```
1              This, for me, is really surprising.  This comes to me
2     as a shock.  Because if she did something that was not right
3     for this country, she did not do that with any ill intention.
4     And also -- and well, she always -- she always helped me to
5     achieve my goals, to go after my objectives.  She never, ever
6     offered me any drugs or anything like that when I was growing
7     up.  Never, nothing to do with alcohol, nothing to do with
8     drugs, nothing that had anything to do with things that come
9     easy, never.  She always told me that the right way to do
10    things, it was through correct path to do things.  And she has
11    always pushed me to go forward.  Sometimes I have wanted to
12    kind of abandon my own project, but she's always been there to
13    push me to go forward.
14             And I've also learned many lessons from her.  And this
15    has been an example to me.  Like this time that -- when the
16    problem came about and she was in jail and all that, and she
17    left.  And when she came out of jail, she left and she went to
18    do a whole new life for herself and to do different things.
19    She left with her son with no money whatsoever.  She went to a
20    shelter.  She got a job.  And this was very challenging for her
21    because in that job she had to speak English.  And at work she
22    was very, very highly appreciated, because, despite the
23    language barrier, she was doing her job very well.
24             And I'm very proud of her and I'm very, very sorry for
25    all this situation.
```

```
1              THE COURT:  Thank you, Ms. Rodriguez.

2         Thank you.

3         Good afternoon, sir.  What is your name?

4         MR. LOSACO:  Jose Losaco.

5         I know Ivonne from work.  I'm a manager at The

6    Cheesecake Factory, a senior manager.

7              She came to work for us in recommendation from her

8    daughter Laura.  She was our napkin folder, but she was so much

9    more than that.  She would always help out whenever we needed

10   help.  She would come on time.  She'd get her job done.  She'd

11   ask if we needed any more help at all.  She was just a great

12   employee.  All the staff enjoyed her company.

13             When I found out she was from Venezuela -- because I'm

14   from Venezuela as well -- then we were able to talk about

15   families and situations going on in Venezuela.  And we got to

16   that personal level through that.

17             Now, I mean, she's a great person.  Every day I would

18   come in, she'd say:  "Hi, Jose, mi canto," and just brighten my

19   day.  And the fact that she -- when she told me that she had to

20   go to Indiana to take care of her son, I understood because in

21   my profession we have people that come in and go and leave.  So

22   I understood that, but I still missed her.  And every time that

23   Laura would talk to her, she would always say:  "Hey, how's

24   Jose doing," and I would ask her the same thing, how she's

25   doing up there, up in Indiana, how she likes the cold, because
```

1    I know she hated the cold.

2             But in terms of employment, she was great at it and I

3    do miss her being in the restaurant.  And that's all I really

4    have to say.

5             Thank you.

6             THE COURT:  Thank you, Mr. Losaco.  I appreciate your

7    comments.

8             Good afternoon.  What is your name?

9             MR. CHASE:  My name is Kevin Chase.  I'm here to speak

10   on Ivonne's behalf as well.

11            I'm a manager as well at The Cheesecake Factory.  I

12   had the pleasure of working with Ivonne for about six to seven

13   months.  She's just a wonderful person.  She always had a

14   smile.  Always did stuff to bring smiles to people's faces.

15            Right now, we're actually raising peanut butter for

16   local food banks.  The whole company raises it.  She went out

17   of her way to bake cakes to -- you know, that we can raise

18   money and sell to help, you know, with less fortunate people,

19   you know, give them meals to eat.  She's very family-oriented.

20   She always has a smile on her face.  And like Jose said, she

21   was just a very big asset to our team, always bringing the

22   positivity.

23            And she had to take care of her family.  Her family is

24   the number one important thing to her.  So she picked up and

25   moved out of Venezuela.  Then out of Florida to go somewhere

1    she doesn't know where, Indiana.

2            So that's all I really had to say.  But, you know, she

3    is a wonderful human being.  And, you know, we definitely truly

4    miss her not at work and, you know, her not being around

5    anymore.  So ...

6            THE COURT:  Thank you, Mr. Chase.

7            MR. CHASE:  Thank you.

8            Mr. Berrio?

9            MR. BERRIO:  Yes, Your Honor.

10           Yes.  At this point, I have nothing else to say.  I

11   don't know if Ivonne wants to address the Court.

12           THE COURT:  Certainly.

13       (Pause in proceedings.)

14           THE DEFENDANT:  Thank you, Your Honor, for the

15   opportunity to speak.

16           First of all, I'd like to tell Your Honor that I've

17   always tried to make a good family out of mine and for us to be

18   good citizens.  I always thought that if everyone made out of

19   their family a good family, therefore, there would be good

20   citizens.

21           I would want, Your Honor, for you to be as lenient as

22   possible so our family stays together as much as we possibly

23   can.

24           I understand everything that has happened here and

25   everything that has been said here.  I understand the position

1    of the prosecutor's office and I understand what my attorney

2    has told me and what the laws in this country are.  I just ask

3    you to please allow me to continue to raise my children and to

4    make of them good citizens, and I want to thank you for the

5    opportunity.

6            THE COURT:  Thank you, Ms. Russa Mosqueda.

7            Mr. Berrio, is there anything further, sir?

8            MR. BERRIO:  No, Your Honor.

9            Thank you.

10           THE COURT:  Ms. White?

11           MS. WHITE:  Your Honor, this is -- it's a difficult

12   situation in that the head of this conspiracy has already been

13   sentenced and he got a lot of benefits that this Defendant is

14   not getting.  He got the benefit of safety valve.  He got the

15   benefit of a variance.  As Your Honor heard about his

16   cooperation, he got the benefit of acceptance of

17   responsibility.  He got several things that she's not getting

18   because she took a different path in this case.

19           The United States believes that a sentence at the very

20   low end of the guidelines is appropriate.  Mr. -- and I've

21   forgotten counsel's name.  It's completely slipped my mind.

22   I'm sorry.

23           MR. BERRIO:  Berrio.

24           MS. WHITE:  Berrio.

25           Mr. Berrio indicates that he wants the same sentence

1    that the United States is recommending for Nayibe Noa.  And

2    then asks for 24 months in -- of home confinement.  The United

3    States has not recommended home confinement for any of these

4    defendants.  So I'm not sure where that is coming from.

5         Mr. Berrio also references several things that he

6    referenced during the trial and he's referencing now.  He keeps

7    bringing up that Hugo Urdaneta Galvis was charged with money

8    laundering.  He was charged with money laundering and using

9    drug proceeds to purchase more drugs and continue the drug

10   business, not in the sense that he keeps inferring.

11        And he also keeps talking about the case being

12   dismissed at the state level.  The case was dismissed at the

13   state level not due to any deficits in the evidence, but

14   because the United States Attorney's Office was picking it up

15   for prosecution.

16        The other defendants that have been sentenced in this

17   case, besides Mr. Urdaneta, had children.  They had no criminal

18   history.  Aside from Candido Garcia, no one in this case had

19   criminal history.  So they're all -- the others have been

20   similarly situated in that respect.

21        As to Jorge Contreras Ramos and Nelson Galvis

22   Urdaneta, and as to Nayibe Noa, there was no evidence that any

23   of them was in contact with customers, that they supervised

24   anyone, that they filed taxes for the business, that they kept

25   the books, that they handled payroll, that they communicated

1   with the vendors.  All of those things were brought out in

2   trial, were things that the Defendant here for sentencing has

3   done.

4        Considering everybody that we know of that was

5   involved in this conspiracy, aside from Hugo Urdaneta, Ivonne

6   Russa did the most to move it forward.  She was responsible for

7   that lab.  She was the -- she admitted being the boss of that

8   lab.  All the evidence is that she was Hugo Urdaneta's right

9   hand in running the lab, in supervising people, in hiring

10  employees to work at the lab.  And there is no evidence like

11  that against anyone else in this case, except for Hugo Urdaneta

12  Galvis.

13       The United States sympathizes with the Defendant and

14  the fact that she has an 18-year-old son who is in high school.

15  Even though 18 is an adult, it's still very young.  And he is

16  going to suffer for the choices that she made, as all children

17  end up suffering for the choices of their parents.

18       But the variance -- or it's actually a departure that

19  the Defense is seeking, is for exceptional family

20  circumstances.  The guidelines are very clear that family ties

21  and responsibilities aren't relevant, unless there is some type

22  of extraordinary circumstance, which there has been no evidence

23  that that's present in this case.  And it's undoubtedly sad and

24  it's very difficult for her family.

25       But I believe that, given all the circumstances and

1    given the choices that the Defendant made, and given that she

2    came to court and testified completely contrary to what she

3    told the detectives when she was arrested, that she knew she

4    was dealing in steroids -- she came to court under oath and

5    claimed that she now doesn't know that she's dealing in

6    steroids and she thought she was dealing in vitamins, that is

7    also something that the other defendants who have been

8    sentenced did not do.  And she should not be rewarded with less

9    than anybody else who has been sentenced in this case,

10   especially those who had less of a part in the conspiracy than

11   her.

12          The two men that were arrested at the Rodman Street

13   address were factory workers, they were not supervisors, and

14   the Defendant should not be awarded with home confinement while

15   they sit in prison.

16          THE COURT:  All right.  Thank you, Ms. White.

17          Mr. Berrio, is there anything further, sir?

18          MR. BERRIO:  Yes.

19          With regards to the extraordinary circumstances and

20   familial responsibilities, Ms. White indicates that the other

21   two gentlemen who were sentenced also have family members.  I

22   don't know, however, if they are married or they have a -- the

23   parent, the other parent of those children that are active and

24   are available to raise their children while they're

25   incarcerated.

1    In our situation, Rommer was raised by his mother and

2    his sister.  And they're both looking at incarceration here.

3    So I would suggest that that's a different situation.  I don't

4    know what the situation of the other gentlemen are.

5    I believe the fact that these two labs, the Sheridan

6    Street lab and the Rodman Street lab, were both in operation

7    and both functioning.  And apparently, the Rodman Street lab

8    was doing just fine for the year and a half it was in operation

9    after Sheridan was shut down and grossed almost a million

10   dollars.  I think that says a lot in terms of there's somebody

11   there that filled Ivonne's role.  And I think it was Nayibe Noa

12   or Nelson Urdaneta, who was actually living at that unit as

13   well, at the lab.

14   So for Ms. White to say that Ms. Russa is more

15   culpable than these other individuals at that other lab I don't

16   think is accurate.  I think she did say and she did take

17   responsibility.  She did explain who's doing what here in the

18   Sheridan Street lab.  But the Rodman Street had the same

19   structure.  It was run by the same individual, Hugo Urdaneta.

20   And his mother took a more active role in that lab, even after

21   she knew that the Sheridan Street had been shut down.  So I

22   think Ivonne is less culpable than Nayibe Noa.

23   Thank you, Your Honor.

24   THE COURT:  All right.  Thank you, Mr. Berrio.

25   Ms. Russa Mosqueda, I certainly am aware that your

1    involvement in this case has caused significant issues with

2    your 18 year-old son Rommer, and the Court certainly read that

3    in the Presentence Investigation Report.

4         I am also aware of your medical issues, including your

5    need to use a CPAP machine, your diabetic condition, and the

6    high blood pressure.  I am also aware that this Court has

7    already sentenced three individuals -- actually five, but I'll

8    speak of the three individuals that have actually had a

9    sentence imposed.  The other two individuals are before the

10   Court today, as you know, your daughter and Mr. Soodak.

11        And in those cases -- and I'll speak first of

12   Mr. Galvis, who, in fact, was the ringleader, did answer to the

13   conspiracy charges, as well as the money laundering, and had

14   the benefit of a plea agreement, in which four charges were

15   dismissed.  In that case, he did cooperate with the Government.

16   The Court did recognize that he did benefit from his

17   cooperation.  And, in fact, as a result, the Court did sentence

18   him to 46 months of imprisonment, even though he was, in fact,

19   the ringleader, but he did accept responsibility.  And as far

20   as his guidelines were concerned, he certainly benefited.

21        In just looking at the advisory guidelines -- and of

22   course, they are advisory, but you don't have the benefit of

23   that safety valve reduction.  You certainly don't have the

24   benefit of any acceptance of responsibility or cooperation.

25        And in looking at your respective role, as compared to

1   the other individuals that may have been involved in this

2   conspiracy, you did, in fact, maintain the books and records.

3   You did pay the property taxes.  You did take a managerial and

4   supervisory role at this lab at Sheridan Street.  And in fact,

5   the lab itself could not function or operate without your daily

6   managerial expertise.  You gave direction to others, including

7   your daughter and Mr. Soodak, and the testimony and evidence at

8   trial certainly established that you had a much greater role

9   than other individuals.

10        Since you have not objected to the facts set forth in

11   the Presentence Investigation Report, and as was consistent

12   with the testimony at trial, steroids from this house in Dania

13   Beach were packaged for street sales and shipments throughout

14   South Florida and South America.  You would receive text

15   messages from Mr. Urdaneta to advise of certain shipments and

16   delivery of steroids.  You created a chat group, a WhatsApp

17   chat group.  And that was the basis of communicating with the

18   other participants.  You shared information regarding steroid

19   orders and you ensured that the tax returns were filed for

20   Sport Nutrition group.  And you maintained those premises for

21   the purpose of manufacturing or distributing a controlled

22   substance.  And as a result, that's why the advisory guideline

23   range is what it is.

24        I certainly have taken the time to read the letters

25   that you took the time to file with the Court, as well as

1    listening to the testimony of the two individuals that you work

2    with at The Cheesecake Factory, and your lifelong friend,

3    Ms. Rodriguez.  And as the Court noted from the Presentence

4    Investigation Report, this is the first time that you have been

5    involved in the criminal justice system.  I recognize that you

6    were arrested by the Broward Sheriff's Office and no

7    information was filed in that case.  And that's because the

8    federal government decided to take over the investigation and

9    the eventual prosecution.

10          But certainly the Court has taken into consideration

11   your medical condition, the fact that at the age of 47 you have

12   not been involved in the criminal justice system.  But

13   recognizes that you were involved in this conspiracy from March

14   of 2012 until September of 2016.  And certainly that was a

15   significant period of time.

16          Ms. White is correct that if the Court were just to

17   look at the months of incarceration, it would appear that

18   Mr. Urdaneta, who is the ringleader, should be receiving the

19   largest sentencing in this case, because, in fact, this was his

20   creation.  You merely managed and participated in this

21   conspiracy in order to continue this for the long period that

22   you did.  However, the Court, while recognizing the cooperation

23   that Mr. Urdaneta provided, recognizing his acceptance of

24   responsibility, and recognizing the benefit that he received

25   when the Court ultimately sentenced him, this Court believes

1    that a sentence below the advisory guideline range is

2    appropriate.

3            And that is why, after considering the statements, the

4    Presentence Report, which contains the advisory guidelines, and

5    a full consideration of the statutory factors of 18, United

6    States Code, Section 3553(a), first and foremost, Ms. Russa

7    Mosqueda, it's the finding of the Court that you are not able

8    to pay a fine.  But it will be the judgment of the Court that

9    you will be committed to the Bureau of Prisons to be imprisoned

10   for a total of 46 months as to Counts 1, 2, and 3, to be served

11   concurrently.

12           Upon your release from imprisonment, you shall be

13   placed on supervised release for a term of two years as to each

14   of Counts 1, 2, and 3, all such terms to run concurrently.

15           Within 72 hours of your release from the custody of

16   the Bureau of Prisons, you shall report in person to the

17   Probation office in the district where you are released.

18           While on supervised release, you shall comply with all

19   mandatory and standard conditions of supervised release.  And

20   that includes not committing any crimes.  You are prohibited

21   from possessing a firearm or other dangerous device.  You shall

22   not unlawfully possess a controlled substance.  And you shall

23   cooperate in the collection of DNA.

24           You shall also comply with the following special

25   conditions, and that is to cooperate with Immigration during

1    the removal proceedings, to surrender to Immigration for

2    removal after you've served your term of imprisonment.  There

3    will be a financial disclosure requirement, a permissible

4    search and a disclosure of any telephone records, as requested,

5    and the payment of unpaid restitutions, fines, or special

6    assessments.

7            Since you have been found guilty of three counts, you

8    shall immediately pay to the United States a special assessment

9    of $100 as to Counts 1, 2, and 3, for a total of $300.

10           Now that the sentence has been imposed, Ms. Russa

11   Mosqueda, do you or Mr. Berrio object to the Court's finding of

12   fact or the manner in which the sentence was pronounced?

13           MR. BERRIO:  No, Your Honor.

14           THE COURT:  Let me advise you that you do have the

15   right to appeal the sentence imposed.  Any Notice of Appeal

16   must be filed within 14 days after entry of the judgment.

17           If you're unable to pay the cost of the appeal, you

18   may apply for leave to appeal in forma pauperis, which means

19   there would be no cost to you.

20           Are there any requests, Mr. Berrio?

21           MR. BERRIO:  Yes, Your Honor.

22           If Your Honor would recommend a South Florida

23   designation.

24           THE COURT:  Certainly.

25           MR. BERRIO:  And possibly, if possible, that she be --

```
1    that Laura, if possible, if Your Honor decides to sentence

2    Laura to prison, that they be together.  So she could help --

3            THE COURT:  I'm certain that Mr. Wilcox will make a

4    recommendation.

5            MR. BERRIO:  So she could tend to her -- she has

6    medical needs.

7            THE COURT:  Yes.  Of course.

8            So with regard to those medical needs, are you

9    requesting that there be a facility that accommodates Ms. Russa

10   Mosqueda's needs?

11           MR. BERRIO:  Please, Your Honor, as close to South

12   Florida as possible.

13           THE COURT:  Is there anything further, sir?

14           MR. BERRIO:  No, Your Honor.

15           THE COURT:  I note that Ms. Russa Mosqueda has been

16   out of custody on the same bond conditions that were imposed.

17   Is there any reason why Ms. Russa Mosqueda should not be

18   immediately remanded to the custody of the US Marshal?

19           MS. WHITE:  None known to the United States.

20           MR. BERRIO:  Your Honor, I request if Your Honor would

21   let her finish organizing -- now with Rommer's situation,

22   Rommer's in school -- just finish getting everything in order.

23   If she could surrender at a future date, depending on how

24   Laura's sentencing goes and so that she could address Rommer's

25   situation.
```

```
1            THE COURT:  Mr. Berrio, I appreciate the difficulty
2       that's been placed on Ms. Russa Mosqueda's son, who is in high
3       school and is 18 years of age.  But Ms. Russa Mosqueda has been
4       out on pretrial release conditions and she will be remanded to
5       the custody of the US Marshal to begin service of her sentence.
6            MR. BERRIO:  Your Honor, would Your Honor allow
7       Ms. Mosqueda to stay and listen to Laura's sentencing
8       proceeding?
9            THE COURT:  I believe that the -- when the Court
10      orders the remand, that she's going to need to be taken into
11      custody at this time.
12           MR. BERRIO:  She can't just sit and see how her --
13           THE COURT:  We can have her sit to the side.
14           Would that be acceptable?
15           Could we place Ms. Russa Mosqueda over to the side and
16      then we'll proceed with the next case.
17           MR. BERRIO:  Thank you, Your Honor.
18        (Pause in proceedings.)
19           THE COURT:  With regard to Ms. Russa Mosqueda's
20      Venezuelan passport, Mr. Berrio, who would you like the
21      Probation officer to provide that to?
22           MR. BERRIO:  To her brother.
23           THE COURT:  Is there a name that we can provide to
24      the --
25           MR. BERRIO:  Ivan Russa.  Ivan Russa.
```

1          THE COURT:  All right.  Thank you, Mr. Berrio.

2          The best of luck to you, Ms. Russa Mosqueda.

3      (Proceedings concluded at 2:38 p.m.)

```
 1    UNITED STATES OF AMERICA        )

 2    ss:

 3    SOUTHERN DISTRICT OF FLORIDA  )

 4                    C E R T I F I C A T E

 5          I, Yvette Hernandez, Certified Shorthand Reporter in

 6    and for the United States District Court for the Southern

 7    District of Florida, do hereby certify that I was present at

 8    and reported in machine shorthand the proceedings had the 21st

 9    day of September, 2018, in the above-mentioned court; and that

10    the foregoing transcript is a true, correct, and complete

11    transcript of my stenographic notes.

12          I further certify that this transcript contains pages

13    1 - 39.

14          IN WITNESS WHEREOF, I have hereunto set my hand at

15    Miami, Florida this 31st day of December, 2018.

16

17                        /s/Yvette Hernandez
                          Yvette Hernandez, CSR, RPR, CLR
18                        Certified Shorthand Reporter
                          400 North Miami Avenue, 10-2
19                        Miami, Florida 33128
                          (305) 523-5698
20                        yvette_hernandez@flsd.uscourts.gov

21

22

23

24

25
```